## THE GOTHIC STAR.

District Court, S. D. New York.
June 15, 1933.

Bigham, Englar, Jones & Houston, of New York City (James N. Senecal, of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (L. deGrove Potter and William H. Postner, both of New York City, of counsel), for respondent.

PATTERSON, District Judge.

The libelant shipped 2,555 boxes of Winter Nelis pears on the respondent's refrigerating ship Gothic Star. When loaded at Seattle on November 6, 1928, they were in apparent good order. When discharged at Hull, England, on January 12, 1929, a considerable quantity proved to be decayed and unfit for use. This suit is for the damage.

Winter Nelis pears are known for their keeping qualities. In Washington the crop is picked in September, and the pears will generally keep for six months under proper storage. The pears in question had been in cold storage warehouses at interior points in Washington. On shipment into iced cars on November 3, 1928, they were examined by inspectors of the Washington Department of Agriculture and found to be "mostly hard, few firm." Three days later they were loaded on the Gothic Star in apparent good order, with temperatures ranging from 42 to 50 degrees.

The Gothic Star is a refrigerating vessel, equipped for carrying fruit from the Pacific Coast to European points. The compartments are insulated and kept cold by the cold air system, cold air being driven through a trunk along the starboard side, escaping into the compartments through holes in the trunk and being sucked back through similar holes in a trunk along the port side. In this way cold air constantly circulates across the compartments and the desired low temperatures are maintained. The cold air method is superior to the brine method often used on refrigerating ships, and the proof here is that the Gothic Star was seaworthy and fit for the carriage and refrigeration of cargo.

These pears were stowed in the forward part of No. 4 tween decks, a compartment which was thoroughly insulated. Apples and other pears were placed aft. The stowage was in the usual way, with dunnage between the tiers to permit air circulation through the pile and with about a six-inch clearance at the top. The compartment was equipped with six thermometer tubes, three on each side, in which thermometers were suspended about midway on strings; the thermometers were pulled up to the deck above and read every four hours.

The Gothic Star, on leaving Seattle, touched at Portland and San Francisco. At Portland the No. 4 hatch was opened for the loading of cargo into the lower hold. To protect the cargo in the tween decks a temporary hatch was constructed of planks with thick paper pasted over the seams. At the other end of the voyage the ship discharged cargo at Southampton, London, Rotterdam, Hamburg, and finally at Hull. At most of these ports the hatch of this compartment was opened long enough to discharge fruit; the same temporary structure being used. There was no untoward incident on the voyage. The thermometers in the four tween decks uniformly showed temperatures of around 34 de-

grees, once the pears were thoroughly cooled after shipment.

The contract of affreightment exempted the carrier from liability for damage caused by decay. The damage here being the decayed condition of the fruit, it was incumbent on the shipper to show by a preponderance of proof that negligence on the carrier's part caused or contributed to the decay. In my opinion, the shipper has not sustained this burden.

The refrigerating capacity of the vessel was not defective. It is true that one or two expert witnesses called by the shipper found fault with the fact that the outlet ducts were somewhat lower than the intake ducts, but the weight of evidence indicated that this feature would not interfere with the satisfactory circulation of cold air throughout the compartment. The stowage was proper, and the care given in transit was all that could reasonably have been expected.

It is significant that the surveyor who inspected the cargo at Hull for the shipper had no criticism to make of the refrigerating equipment or of the stowage, but said that warm air must have entered the compartment when it was opened at other ports for discharge of cargo. Yet the record shows that low temperatures were maintained in the compartment during discharge at the earlier ports, and also that the outside air at these ports was not warm, being at the freezing point or only a few degrees above. The likelihood of damage to the pears when the compartment was opened at Southampton and other ports was thus negatived.

Prior to shipment on the Gothic Star, the pears had been kept in warehouse for some two months. There is nothing to show what the conditions of storage were. When loaded into cars, most of the pears appeared hard, but some were found to be only firm. This may well indicate that the cause of the decayed condition of part of the fruit on arrival at Hull was some fault antedating shipment at Seattle. While the state inspectors passed the pears as fit for export, there is nothing to show that they regarded the pears as in fit condition for the extremely long voyage upon which they were sent. In any event, there is no proof of negligence by the carrier, and the libelant has failed to establish his case.

The carrier defended also on the ground that the shipper had not complied with the notice of claim clause in the bill of lading. In my opinion, the shipper has proved that the requirements of this provision were fulfilled.

The libel will be dismissed.