### THE MONTE ICIAR.
No. 69 of 1945.

District Court, E. D. Pennsylvania.
Aug. 15, 1946.

202

George E. Beechwood, of Conlen, La-Brum & Beechwood, all of Philadelphia, Pa., for libellant.

Harrison G. Kildare, of Rawle & Henderson, all of Philadelphia, Pa., for respondents.

BARD, District Judge.

This is a libel for cargo loss against the steamship "Monte Iciar" and her owners, Naviera Aznar S. A. On the basis of the pleadings and the testimony, I make the following special

### Findings of Fact.

1. At all times involved in this case, the libellant was, and now is, a corporation duly organized and existing under the laws of the District of Columbia, with its principal place of business at 2410 Eighth Place, N.E., Washington, D. C.

2. Respondent, Naviera Aznar S. A., was at all times involved in this case, and still is, a corporation duly organized and existing under the laws of Spain, owning and operating as a common carrier several steam vessels engaged in the carriage of cargo upon the high seas. Among the vessels owned and operated by respondent is the steamship "Monte Iciar," which is within the jurisdiction of this court.

3. During the month of February, 1944, A. Deleyto delivered to respondent Naviera Aznar S. A. at the port of Cadiz, Spain, a shipment of seventy wooden barrels containing dry sherry wine consigned to "Order—Notify: Messrs. Park Benziger & Co. Inc.—24 State Street—New York."

4. On February 28, 1944, respondent's duly authorized agent, the captain of the "Monte Iciar," issued a bill of lading covering this shipment of wine, acknowledging receipt of seventy barrels of wine, gross weight 48,349 kilograms, net weight 41,774 kilograms. The bill of lading provided for shipment to Philadelphia, Pennsylvania. The face of the bill of lading bore a stamped notation, "Not Responsible for Leakage, Breakage or Spigoting." This notation had been applied prior to the time that the captain of the "Monte Iciar" signed the document.

5. In February 1944 the United States Consul at Seville, Spain, issued a Consular Invoice of Merchandise covering this shipment, which stated that the shipment consisted of 11,200 gallons.

6. Libellant purchased this shipment from Park, Benziger & Co., Inc. prior to the date of shipment of the wine.

7. The barrels were the usual type of container used for transporting wine. They were not new, but appeared to be in sound condition when loaded aboard the vessel. At the time of loading there was no evidence of loss of contents from the barrels.

8. Libellant's shipment of seventy barrels comprised a portion of a total of 391 barrels of wine of three different sizes, which were stowed in number 3 and number 4 'tween decks. There is no evidence as to the exact location of libellant's shipment within this general area. A floor of dunnage wood was laid over the entire 'tween deck, with the exception of the portions over the wooden covers above the opening to the hold. The barrels were stowed head up in a single tier, except for those in the square of number 3 hatch, which were laid in three tiers, fore and aft, arranged bung-up in bilge and cantline fashion, extending to the top of the hatch coaming. A layer of dunnage wood was placed on top of the single tier of barrels stowed head up, with three to five tiers of cases of brandy placed on top of the dunnage wood. The barrels were protected from the skin of the ship by a wall of dunnage wood. The portion of the shipment placed in the square of number 3 hatch, which was arranged in bilge and cantline fashion, was well braced with chocks and quoins.

9. The 'tween decks of the "Monte Iciar" are approximately eight feet high, except under the hatch cover, where the height is approximately eleven feet. Although the recommended practice of stowing barrels, where multiple tiering is involved, is bilge and cantline, it is regular and customary to stow barrels in the 'tween decks of Spanish vessels in a single tier, head up, because of the low ceiling in 'tween decks.

10. The "Monte Iciar" arrived at Philadelphia, Pennsylvania, on April 9, 1944. She was berthed at Pier 55 South on April 10, 1944, and discharged the cargo in number 3 and number 4 'tween decks on April 12 and 13, 1944. The barrels were discharged from the vessel by the ship's tackle in the customary and accepted manner.

11. Inspection of number 3 and number 4 'tween decks prior to discharge did not reveal any indication that the cargo therein had shifted during the course of the voyage. After the cargo had been discharged, the dunnage wood and the floor of number 3 and number 4 'tween decks were found to be clean and dry.

12. None of the barrels was observed to be leaking during discharge of the cargo.

13. A day or two after discharge, when the entire shipment of barrels was on the pier, the ship's Second Officer observed one barrel leaking, and thereafter the Captain observed "some" barrels leaking, from the joints of the barrel staves. The observations of the Captain and the Second Officer were made with respect to the entire cargo of barrels in general, and neither identified the leaking barrels as ones which formed a part of libellant's shipment.

14. When libellant's shipment arrived at Philadelphia, a Customs in Bond Transportation Application was filed with and accepted by the Collector of Customs at Philadelphia for transportation of the shipment in bond to the Collector of Customs at Baltimore, Maryland, with libellant as consignee. This was done by Charles Kurz Co., libellant's agent. The Collector of Customs permitted the wine to be shipped under an "In Transit" bond to Baltimore, Maryland, where, according to United States Customs regulations, the actual contents of the barrels were to be measured or "gauged," and appropriate duties thereafter assessed.

15. On April 17, 1944, the Customs authorities at Philadelphia gauged the contents of seven barrels forming part of libellant's shipment on the pier. According to the practice of the Collector of Customs, gaugeable goods under an "In Transit" bond are not gauged on the pier unless the containers have been repaired or recoopered, or unless there is reason to believe that loss of contents has occurred. In such cases, they are gauged regardless of whether or not there has been actual loss of contents. This Customs gauging

shows actual contents only, and does not purport to show loss of contents.

16. Libellant's shipment of seventy barrels was subsequently transported via Pennsylvania Railroad to Baltimore, Maryland, under a bill of lading issued on April 18, 1944. The bill of lading contained a notation that seven barrels had been recoopered. The other sixty-three barrels were in good condition when they were delivered to the railroad. The recoopering was performed by the agents of the Pennsylvania Railroad.

17. Libellant's cargo surveyor examined the shipment on May 6, 1944, when the barrels were aboard three Pennsylvania Railroad freight cars at Baltimore. It was found that several of the barrels in one car were leaking so badly that wine was flowing from the car door. Inspection revealed that two barrels had loose hoops, one had a "buggered" stave, and four were leaking at the bungs and heads.

18. The leaking barrels were all within one general location in the same freight car, stowed in adjacent rows. No leakage was noted in the other two cars.

19. The agents of the Collector of Customs at Baltimore gauged libellant's entire shipment, and found that actual contents amounted to 10,959.3 gallons of wine.

### Discussion.

This case is before the court on the question of liability only, the parties having agreed to submit the question of damages, if any, to a commissioner.

Before proceeding with a discussion of the merits of the case, it is appropriate to deal with respondent's contention that the present libellant has not been established as a proper party in interest. Libellant, by deposition, adduced the testimony of Mr. J. P. Benziger, President of Park, Benziger & Co., Inc., the company which appeared as consignee of the shipment on the bill of lading issued by respondent. Mr. Benziger testified that Park, Benziger & Co., Inc., had actually sold the shipment to libellant before the wine was shipped from Spain; that he remembered the transaction, because he had sold the wine himself; and he identified an invoice to libellant dated April 26, 1944, covering the shipment, which indicated that the wine was sold to libellant F.O.B. Cadiz, Spain. Mr. Benziger explained that libellant was not invoiced prior to April 26, 1944, because Park, Benziger & Co., Inc. had to wait until that date, when the gallonage list was received from A. Deleyto, the supplier, in order to prepare the invoice properly.

In Hickman, Williams & Co., Inc., v. Murray Transportation Co., D.C.S.D.N.Y., 31 F.Supp. 820, 822, a libel for cargo loss, libellant depended entirely upon the testimony of one of its own officers to prove ownership of the cargo, which was consigned to a third party on the bill of lading. In denying respondent's motion to strike this testimony, the court said:

"The witness was an officer of the company. He was familiar with the transactions, which were mainly oral. I think it was entirely proper for him to state that his company was the owner of the cargo. In this regard he was testifying to a simple fact, one within his knowledge. The witness knew the facts, and he was qualified to answer the question as to ownership * * *

"It might be argued from the bill of lading, that the Lukens Steel Company was presumptively the owner of the cargo inasmuch as it was consigned to them. That being only a rebuttable presumption, it has been answered by the testimony of the witness * * *."

In the foregoing case, the court admitted the testimony of one of libellant's own officers to rebut the presumption of ownership in the consignee of the bill of lading. Certainly, then, in the instant case, it is no less proper for an officer of the vendor company, not a party to this action, to testify as to actual ownership of the shipment.

Mr. Benziger's testimony stands uncontradicted, and I think it clearly establishes that libellant acquired title to the wine by purchase prior to its shipment from Spain. I therefore conclude that libellant is a proper party in interest to maintain this libel.

I now pass to a consideration of the merits of the case. Libellant contends (1) that inasmuch as the cargo of wine was de-

livered to respondent in good order and condition, it is incumbent upon respondent to explain any shortage upon delivery; (2) that respondent failed to stow, carry and discharge libellant's wine properly and carefully; and (3) that respondent has not shown that the shortage in and damage to the barrels of wine were within an exception permitted by the Carriage of Goods by Sea Act, nor that the loss did not arise without the actual fault or privity of respondent, its agents or servants.

The bill of lading in the instant case contained a statement, "Not responsible for leakage, breakage or spigoting." The evidence showed beyond a doubt that libellant's loss comes within that description. It is of utmost importance, therefore, to determine what effect should be given to this exception in the bill of lading in the light of any statutory provision which might be applicable thereto.

Both libellant and respondent suggest that the present claim is controlled by the provisions of the Carriage of Goods by Sea Act.[1] That Act, by its own terms, expressly limits its applicability to one definite period of time during the existence of the carrier-shipper relationship. The Act provides that

" * * * every bill of lading * * * which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, shall have effect subject to the provisions of this Act."

Section 1 of the Act reads:

"(e) The term 'carriage of goods' covers the period from the time when the goods are loaded on to the time when they are discharged from the ship."

Section 7 of the Act reads:

"Nothing contained in this Act shall prevent a carrier or a shipper from entering into any agreement, stipulation, condition, reservation, or exemption as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea."

It will be noted that the Act does not cover the period of time prior to loading, nor—which is more important in the present determination—does it cover the period of time subsequent to discharge of the cargo, until delivery thereof to the consignee.

How, then, do the facts of the instant case bring it within the purview of the Carriage of Goods by Sea Act? This libel is based upon the loss of contents from certain barrels of wine. There is no evidence that the barrels were leaking at the time they were loaded aboard ship. If, as is frequently the case, the loss had been apparent upon discharge of the cargo, I would have no doubt that the Carriage of Goods by Sea Act would govern respondent's liability. However, in the instant case, there is no evidence whatever of any loss of contents or damage to the barrels at the time they were discharged. An inspection of the 'tween decks, where libellant's cargo had been stowed, showed that that space was clean and dry.

The first evidence of any loss of contents from libellant's shipment was the gauging of seven of its barrels on the pier by the United States Customs authorities on April 17, 1944, at the time the shipment was delivered to libellant's agents, which was four or five days after the discharge of the cargo. I do not think that these facts alone bring libellant's loss within the purview of the Carriage of Goods by Sea Act.

Even though libellant's loss was not manifest until after discharge of the cargo, I think that libellant might bring its loss within the purview of the Act by showing that some act or omission on the part of respondent, its agents, or servants, with respect to the custody, care or handling of the cargo, occurred during the period commencing with loading and terminating upon discharge, and did in fact cause or contribute to the loss. In this connection, libellant did attempt to show that its cargo had been improperly stowed.

Three persons testified as to the method of stowage employed: The captain and the

---

[1] Act of April 16, 1936, 49 Stat. 1207, c. 229, 46 U.S.C.A. § 1300 et seq.

second officer of the vessel, and Mr. Bryant, cargo surveyor for respondent's agent at Philadelphia, who had previously, in the course of his experience, surveyed the cargo of two to three hundred Spanish vessels. Respondent also offered in evidence a certificate purportedly signed by a Lloyd's cargo surveyor in Spain, to the effect that the cargo was properly stowed, to which certificate I attach little importance. The testimony of the captain and the second officer, which was taken by deposition, was vague in many respects; and I rely more upon the testimony of Mr. Bryant with respect to the method of stowage employed, and have found it to be as set forth in Finding of Fact No. 8, supra, which is, incidentally, substantially the same finding which was suggested by both libellant and respondent, although the parties disagree as to whether or not the method employed was proper. Mr. Bryant's testimony further showed that the method of stowage employed was customary and proper for ships of the type of the "Monte Iciar," and his testimony on this point was unrebutted and uncontradicted. Libellant failed to show improper stowage. Indeed, I think that respondent has affirmatively proved proper stowage.

There is no other evidence that any act or omission on the part of respondent, its agents, or servants, during the period commencing with loading and terminating with discharge, caused or contributed to libellant's loss. There is no evidence that the parties to the bill of lading stipulated that the Carriage of Goods by Sea Act should control the shipment prior to loading or subsequent to discharge. My conclusion, then, is that the Carriage of Goods by Sea Act does not govern the validity and interpretation of the exceptive clause contained in the bill of lading in the instant case.

There is, however, another statute which I do think has an important bearing on the present case—the Harter Act.[2] The Harter Act provides that

"* * * It shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect."

■ Comparison of the Harter Act with the Carriage of Goods by Sea Act, supra, reveals this significant distinction: Where a shipment from a foreign port to a United States port is involved, although the provisions of the Harter Act were superseded by the Carriage of Goods by Sea Act with respect to the period of time from loading through discharge of the cargo, nevertheless the Harter Act, insofar as it applies to the period of time subsequent to discharge, up until delivery of the cargo, was not superseded by the Carriage of Goods by Sea Act. This distinction is recognized in Section 12 of the Carriage of Goods by Sea Act.

Inasmuch as any loss of contents from libellant's barrels of wine occurred after discharge of the cargo, it becomes important to construe the exceptive clause in the present bill of lading in the light of the Harter Act. The exceptive clause in the bill of lading provided that the carrier should not be responsible for "leakage, breakage, or spigoting." Whatever loss libellant sustained was manifestly within that description.

■ It is well settled that, under the Harter Act, where the carrier succeeds in bringing the loss of cargo within an exceptive clause in the bill of lading, the shipper can recover only upon affirmative proof that negligence on the part of the carrier caused or contributed to the loss. The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546, 15 Ann.Cas. 748; The Patria, 2 Cir., 132 F. 971; Thomas Roberts & Co. v. Calmar S. S. Corporation, D.C., 59 F. Supp. 203; The Gothic Star, D.C., 4 F. Supp. 240;

---

[2] Act of February 13, 1893, 27 Stat. 445, c. 105, 46 U.S.C.A. § 190 et seq.

The Henry B. Hyde, 9 Cir., 90 F. 114. In the instant case there is no proof whatever of negligence on the part of respondent during the period subsequent to discharge, up until delivery of the cargo. There was evidence which showed that seven of the barrels were recoopered subsequent to discharge, and that this recoopering was performed by the railroad's agents at the request of respondent or its agents; however, I do not think that the fact that respondent called attention to the desirability of re-coopering necessarily indicates that respondent had been negligent with respect to the cargo. I therefore conclude that, by reason of the exceptive clause in the bill of lading, respondent is not liable under the Harter Act for any loss which libellant sustained subsequent to discharge of the cargo, until delivery thereof to libellant's agents.

■ Libellant's shipment was subsequently transported via railroad to Baltimore, Maryland, where it was found, upon arrival, that several of the barrels were leaking badly. The testimony of the railroad's agent showed that the barrels which had not been recoopered were in good condition when they were turned over to the railroad at Philadelphia; and the evidence further showed that whatever recoopering had been performed, had been performed by the railroad's agents. Under these circumstances, I can find no basis for asserting liability against respondent for the loss which was manifest upon arrival of the shipment at Baltimore.

■ I cannot agree with libellant's contention that it is incumbent upon respondent to explain any shortage upon delivery. The only construction of that contention which would support libellant's present claim would be, that even though respondent has shown that the loss came within an exception to the bill of lading, respondent would still have to show and explain the promoting cause of the leakage or breakage in the barrels. I do not think that this interpretation can be sustained. See The Patria, supra; Thomas Roberts & Co. v. Calmar S. S. Corporation, supra; The Folmina, supra. Libellant's second contention, that respondent failed to stow, carry and dis-

charge libellant's wine properly and carefully, has not been established by the evidence. Libellant's third contention, that respondent has not shown that the shortage in and damage to the barrels of wine were within an exception permitted by the Carriage of Goods by Sea Act, has already been answered by the foregoing discussion, in which I have concluded that the Carriage of Goods by Sea Act does not apply in the instant case.

Conclusions of Law.

1. Libellant is a proper party in interest to maintain this libel.

2. Respondent's liability in the instant case is not governed by the provisions of the Carriage of Goods by Sea Act.

3. The Harter Act is applicable to the present libel. Under the Harter Act, respondent is not liable to libellant because the loss was brought within a valid exception to the contract of carriage, and libellant failed to negative the effect of the exceptive clause by showing negligence on the part of respondent, its agents, or servants.

4. The libel is dismissed, with costs.