**UNITED STATES v. APEX FISH CO.**
No. 12105.

United States Court of Appeals
Ninth Circuit.
Sept. 9, 1949.

age sustained "was the result of inherent defect, quality or vice of the goods as shipped aboard the vessel, one of the causes excepted * * * in the Carriage of Goods by Sea Act [46 U.S.C.A. § 1300 et seq.]" and (2) any damage was solely "the result of a strike * * * which said strike prevented the unloading * * "

The district court found that the merchandise was delivered to respondent in good order and condition, that the vessel arrived at the port of Seattle with the merchandise aboard, "but not in like good order and condition, * * * but damaged, destroyed and a portion thereof rendered wholly valueless; that the sole, direct and proximate cause * * * was respondent's exposure of the same to excessive heat in lower holds 3 and 4"; that this constituted negligence, for which there was no excuse. Accordingly the court found the Fish Company entitled to the damages for which decree was entered.

Upon this appeal the appellant asserts that there was failure of proof of good order and condition at time of shipment, and no proof that the herring was damaged on board the ship. On the contrary, it says, the evidence shows that the damage was the result of inherent vice. It is also claimed that the court erred in finding excessive heat in the holds, and that this was the sole cause of the damage. Finally, it is said that the court should have found that the damage to a portion of the barrels of herring, in so far as it resulted on board the vessel, was excused under the "strike exception" of the bill of lading.

The position of Apex is that it did sufficiently prove delivery to the Denali in good order and condition, and that since arrival at destination in bad order appeared, the burden was upon the carrier either to show that the damage is from a cause excepted by the bill of lading or to show that the damage was not due to failure properly to stow or care for the cargo during the voyage. Appellee asserts that not only did appellant fail to sustain this burden, but that the evidence received showed positively that the damage was the result of excessive heat, and that such heat existed in the holds during the voyage. An ex-

J. Charles Dennis, U. S. Atty., Bogle, Bogle & Gates, Claude E. Wakefield, M. Bayard Crutcher, Seattle, Washington, for appellant.

Edward M. Hay, David O. Hamlin and Axel C. Julin, Seattle, Washington, for appellee.

Before DENMAN, Chief Judge, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

Appeal from a final decree in admiralty.

A libel in personam was filed under the Suits in Admiralty Act, 46 U.S.C.A. § 742 et seq., by Apex Fish Company, appellee, against the United States, the appellant, seeking recovery of damages to a shipment of 1358 barrels of mild cured salt herring. The cargo was loaded at Port Wakefield, Alaska, on the Steamship "Denali," then being operated under bareboat charter to the United States, for delivery to the port of Seattle, Washington. The court awarded damages against the United States in the sum of $18,783.92.

Libelant alleged and undertook to prove that the merchandise was delivered to the vessel in good order and condition. That it outturned at Seattle in a damaged or deteriorated condition is unquestioned. Nor is there any dispute as to the amount of the damage.

Respondent added to its denials, as affirmative defenses, pleas that (1) any dam-

amination of the contentions thus made by the respective parties brings us to a consideration of the evidence.

Viewed in the light most favorable to the appellee, the evidence disclosed that appellee operated a saltery at its plant at Port Wakefield, on Raspberry Island in Alaska, located 30 nautical miles northwest of Kodiak. It also operated a reduction plant in conjunction, where herring oil and meal were produced. During the season, herring were brought to the plant daily in fishing boats. Only the choicest fish were selected for the salt herring operation, the remainder being directed into the meal and oil plant.

The herring here involved were received at the plant from July 24 to August 10, 1946. They were immediately processed, after sorting out and rejecting all found small, soft or otherwise unfit. They were salted and packed in barrels. The barrels were laid on their sides, a hole drilled in the side, brine solution added and the barrels placed in the warehouse for curing. After ten days allowed for curing, the barrels were opened and repacked, to fill them on account of shrinkage which occurs in the curing process. On repacking, the brine strength was made to fall within 85% to 90% of saturation and the barrels were reheaded and stored in the warehouse. This repacking process continued to the arrival of the Denali on August 23, 1946, and thus some of the barrels were opened and inspected during the last few days before the ship arrived. On repacking, inspection was made of each barrel and no spoilage or deterioration detected.

The warehouse was covered and was wet and cool. It was over the water on a dock on piling. The temperature at the locality of the warehouse, for July and August, was slightly below normal, and, on the whole, it was cloudy or partly cloudy. There were no clear days in August and but one in July.

This shipment was one of several during the season. The witness who was in charge of the processing and shipping had been engaged in processing and shipping salt herring in Alaska for 32 years. He testified that the processing of this shipment was identical in all respects with the method followed by him for 32 years previous, during which time no losses from spoilage had occurred.

Five or six days before the herring were loaded, some 400 barrels were taken from inside the warehouse and piled on their sides, 3-high, on the dock outside, and against the northeast wall of the warehouse. This, it was testified, was done in order to speed the loading when the ship arrived.

Appellee introduced a photograph of this dock, and the warehouse, to show the location of these barrels. It was not shown when the picture was taken, but it was not taken at any time when these barrels were piled in this location, for it shows no barrels. Their location was indicated by marks placed there by the witness who identified it. But because this portion of the dock in the photograph appears bathed in sunlight, appellant made much of it and of the fact that the barrels were piled in this location. It suggests that the 400 barrels piled in this sunny location roughly corresponded to the 354 barrels from No. 3 lower hold, which were among the first unloaded but which were found in the worst condition at that time. Appellant contends that the heat of the sun on these 400 barrels is what started deterioration in the fish. The purser on the Denali, who counted the barrels as they were loaded, testified that these 400 barrels were in the sunshine when the Denali arrived, that he felt of each one as he counted them, and that they were dry and warm in contrast to those inside the warehouse, which were damper.

Appellant asserts that the herring had been subjected to a mild, or Scotch, cure as distinguished from a heavy or Norwegian cure. This makes the herring more delicate and also more perishable. Basing its argument upon the assumption that there was no proof of undue heat in the holds where the herring were stored, appellant asserts that all that the arrival in damaged condition shows is that the herring were either in bad condition when loaded or were in a condition insufficient to remain sound under the circumstances of the stow-

age and voyage undertaken and contracted for. This, it is asserted, amounts to inherent vice within the meaning of the exceptions in the bill of lading and the Carriage of Goods by Sea Act.[1]

As for the testimony with respect to the barrels piled on the dock, it was testified by the man in charge of them that they had been covered with salt sacks and tarpaulins and kept wet down with a hose until a short time before the arrival of the Denali at the dock, just before noon on the day they were loaded. As for the testimony that these barrels were dry and warm to the touch, there was testimony that a wooden barrel containing brine will always be wet, as the moisture penetrates the wood and appears on the outside of the barrel. It is said the external heat on the dock could not account for the spoilage as the official weather reports for Kodiak, a few miles distant, show a maximum temperature for the week preceding the loading of 66 degrees, which was recorded on August 20. The mean maximum for the seven days was 58.7 degrees. Much of the time these barrels were in the shade of the warehouse. The weather records show that at Kodiak the 17th to the 19th were cloudy and the 20th to the 23rd partly cloudy.

Since the original pack was from July 24 to August 10, and repacking and final inspection followed at about ten day intervals, it is apparent that some repacking occurred as early as August 3 and some as late as August 20. Appellant asserts that with 20 days elapsing between the date of repacking and inspection of some of the barrels and the date of shipment, there is a failure of proof of good order and condition.

Significant facts tending to support the findings of the trial court are that no portion of the shipment escaped some damage. Both the barrels which had been inspected and found sound immediately preceding shipment and those inspected earlier all showed spoilage on unloading. The ex-

tensiveness of the damage would seem to point to a cause of overheating apart from the sun's heat on merely 400 barrels, and apart from causes originating after the inspection of the barrels which were the earliest ones repacked.

Appellee attempted to produce evidence that excessive heat developed in the holds. The merchandise was stowed in lower holds No. 3 and No. 4. No. 3 was located abaft the engine room, separated from it by an alley way. No. 4 lay abaft No. 3. Running the full length of these holds were two shaft alleys, steel enclosed, not insulated. In the shaft alleys, along their inboard sides, were several steam pipes, carrying live steam from the engine room. The pipes were covered with insulation except at their joints. The herring was stowed between these shaft alleys in both of these holds. In No. 4 cartons of canned salmon were over-stowed. The hatch list shows that canned salmon was also stowed in No. 3. One witness testified that the barrels in No. 3 were not over-stowed with the salmon. Other witnesses were not clear as to this.

The Denali arrived in Seattle September 4 and discharge of the cargo was commenced. The 971 barrels in hold No. 3 were discharged. Libelant's inspector at once opened the barrels and noted that the contents were spoiled. The day following, a chemical engineer and a marine surveyor, employed to inspect and survey the damage, arrived at the dock and proceeded to make inspection. They tested the temperature in ten or twelve barrels at random. They found temperatures inside these barrels ranging from 70° F. to 77° F. This was about 19 hours after their discharge. At the time, the dock temperature was 68° F. An unspoiled barrel from another shipment which had been stored on the dock for some time disclosed a temperature of 65° F. They then went into No. 3 hold where the herring had been stowed. By that time a maritime strike had forced the shutting down of the vessel. Their ex-

1. Title 46 U.S.C.A. § 1304 (2) (m): "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—* * * (m) wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods."

amination of the hold was about 5 hours after the crew had left the ship. They found a temperature of 80° F. in No. 3 hold, in the center of the stowage space. In the shaft alleys they found steam leaking from joints in the pipes. They found a stream of hot water in the engine room coming from some source. The marine surveyor, noting that the barrels in No. 4 were still over-stowed with other cargo, suggested that the barrels in No. 3 were probably over-stowed in the same manner. He testified that such stowage would serve to cut off ventilation and the space between the alleys carrying steam pipes would create a hot pocket.

As both parties agree that the damage to the herring must have been caused by heat, and since the testimony of the chemical engineer was that the heat he found in the barrels tested by him could not have been generated by decomposition within the barrels themselves, the finding of an 80 degree temperature in the hold is significant. The 70 to 77 degree temperatures within the barrels must have come from some outside source.

To explain the 80° F. temperature found in the hold, it was shown that the closing down of the vessel and of its ventilating apparatus when the hatches were closed on the departure of the crew would tend to raise temperatures within the vessel for a time until the boilers had a chance to cool down. It is thus asserted that the 80° F. temperature may have come about in that manner. The purser on the ship also testified that he had been in the holds at times during the voyage and found them cool. There was also evidence that other similar cargoes had been successfully carried in these same holds on other trips. It is to be noted that on this same voyage another shipment of salt herring was carried without damage. That, however, was stowed in No. 1 hold, forward of the boiler and engine rooms, a hold which was not traversed by any shaft alleys.

■ We find it unnecessary to express any opinion as to whether the court below properly evaluated the testimony as to the temperature found in the hold. It is well settled that the findings of a trial court will not be disturbed in the absence of manifest error if the findings are sustained by the testimony. The Nichiyo Maru, 4 Cir., 89 F.2d 539. It is our view that the finding of good order and condition at the time of delivery to the vessel is sustained by competent evidence. The evidence of libelant, which the court had the right to credit, disclosed care in the selection of the fish and a method of processing and packing the product which had been used successfully for many years. While appellee did not show examination and inspection of all barrels at the very moment of loading, we think to require such proof would have been unreasonable and impractical.

And since we hold that Apex successfully established such good order and condition at the time of loading, the doctrine of Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 196, 79 L.Ed. 373, applies: "If he (the carrier) delivers a cargo damaged by causes unknown or unexplained, which had been received in good condition, he is subject to the rule applicable to all bailees, that such evidence makes out a *prima facie* case of liability. It is sufficient, if the carrier fails to show that the damage is from an excepted cause, to cast on him the further burden of showing that the damage is not due to failure properly to stow or care for the cargo during the voyage." The Medea, 9 Cir., 179 F. 781.

■ This burden was not sustained. The evidence that the damage resulted from heat, that heats in excess of the prevailing atmospheric temperatures developed in the barrels, that such temperatures could not have come from any cause within the barrels, but must have come from some external source, that steam pipes, with some resultant heat, were in the shaft alleys, and that a high temperature was found in the hold between the shaft alleys where the herring had been stowed, some five hours after the crew had left the vessel, all points, rather, in the direction of improper stowage and care.

The burden of proof being thus on the appellant, it was also charged with the duty of establishing what amount of damage, if any, resulted to the portion of the herring whose discharge from the vessel was

delayed by the strike. If the strike contributed to the bad condition of the shipment, it was incumbent on the appellant to show what portion of the damage was due to this delay.

There was not only no proof that any additional damage was caused by the delay, and no proof that proper care during this period could not have prevented further damage, but there was complete want of evidence to distinguish between damage caused by the strike and damage otherwise occurring. The Lake Fabyan, 4 Cir., 283 F. 771.

As we find no error in the findings and decision of the district court, the decree is affirmed.