## COMPANIA NAVIERA LIMITADA v. BLACK et al. The URANIA.

No. 12322.

United States Court of Appeals
Ninth Circuit.

June 27, 1950.

Merritt, Summers & Bucey, Lane Summers, Charles B. Howard, all of Seattle, Wash., for appellant.

Todd, Hokanson & White, Russell V. Hokanson, Richard S. White, all of Seattle, Wash., for appellee.

Before HEALY, BONE, and ORR, Circuit Judges.

HEALY, Circuit Judge.

Appellant, a Panamanian corporation, in 1948 purchased from the United States the tanker Urania. The ship had been built for the Navy, and after its acquisition by appellant the latter arranged with appellee, a Seattle ship repair concern, for the making of repairs and alterations so as to adapt her for the carrying of commercial cargo. One Williams, a marine surveyor and engineer, was sent by appellant to Seattle to supervise the work as its representative, and he remained on the ground throughout. Williams was empowered to order such additional material and labor as he deemed necessary and he did authorize additional work and parts in an amount of approximately $45,000. The original contract, with which this appeal has very little to do, involved a sum slightly less than that.

The work was completed October 14, 1948, and the ship was ready to sail. Appellant had paid the sum of $25,000, only, on account of work done. To protect itself, appellee filed a libel against the Urania for the balance, whereupon appellant posted a bond and the ship departed Seattle. After the vessel left port certain failures of mechanical parts developed, and because of these difficulties appellant ultimately filed a cross-libel seeking to recover from appellee the cost of corrective repairs, plus collateral expenses, losses of time and profits, et cetera. On the trial the court gave judgment in favor of the libelant for the total amount claimed, and denied any re-

covery on the cross-libel. The appeal attacks the latter provision, only.

Three items of the cross-libel are in controversy here. The first and very much the largest is for the alleged nonperformance or malperformance of the work of cleaning, testing and repairing the lubricating oil cooler on the main engine. The total of this item is about $25,000. It has to do with claimed improper performance of additional work which Williams had authorized. The second item relates to the breakdown of a Clayton boiler, for the cost of repairing which the cross-libelant claims $336.76. This, too, grew out of the additional work authorized by Williams. Finally, there is an item of $387.51 for telemotor repairs and incidental expense at Port Angeles.

A sea trial was had before the vessel departed. During the trial run the engine and its auxiliary parts appear to have functioned normally and to the satisfaction of the owner's representative, Williams, and also to a Mr. Gallagher of the American Bureau of Shipping, both of whom approved the repair work. On October 16, the Urania left Seattle in ballast bound for the Atlantic seaboard. The main engine's failure [item one above] occurred off Manzanillo, about 2,000 miles and 11 days later. The trouble then developing was due to the galling of the engine's helical timing gears in the vertical shaft, necessitating the return of the vessel to Los Angeles for major repairs. The cause of this mishap has furnished the main subject of controversy both below and here.

Appellant's contention is that insufficiently heavy pressure tests were applied in the course of appellee's overhaul of the lubricating oil cooler. The lubricating oil passing through tubing in this oil cooler from the main engine is cooled by sea water passing through jackets in the cooler, similar to the functioning of an automobile radiator except that sea water is used as a coolant instead of air. There is evidence that when the cooler was removed subsequent to the breakdown it was discovered that certain small leaks existed in the soldered seam separating the core from the casing of the cooler. The theory advanced by appellant's witnesses was that salt water coolant infiltrated through the leaks into the lubricating oil in the cooler, causing a contamination of the oil with the resulting galling and wearing of the gears; and it is urged that the pressure test applied in appellee's yard was at fault because inadequate to disclose the presence of these leaks.

All this seems essentially speculative. Appellant's representative, Williams, testified that appellee's work on the unit was done properly and in a workmanlike manner; and other informed witnesses testified to the same effect. There was competent evidence that the method used in testing the cooler was proper and conformed to standard marine practice. Moreover, the testimony shows, and the court found, that the servicing and testing of this unit was done as directed by the vessel's chief engineer pursuant to a contract stipulation to that effect. It is to be noted, also, that the pressure of the oil itself normally exceeded the pressure of the water coolant; and unless this relation were reversed the water could not infiltrate into the oil. If the leaks did in fact admit sea water they might, as the court observed, have developed from ordinary wear and tear subsequent to the overhaul. Too, the judge expressed himself as not being satisfied from the evidence whether contamination of the lubricating oil was the cause of the damage to the gears, nor, assuming that there was contamination, whether the culprit was sea water or some other foreign matter which had been introduced into the oil.[1] He was of the belief that the cross-libelant had failed to sustain its burden of proving, by a preponderance of the evidence, what caused the harm. The formal finding relative to this item of damage is shown below.[2]

1. The oil had been changed the day before Manzanillo was reached and there existed the possibility of contamination at that time.

2. "That all work performed by libelants' employees on main engine of respondent vessel, save that done by riggers, was done at the direction of and under the

·We turn briefly to the second·and third items of the cross-libel. The Urania was equipped with a Clayton boiler for the furnishing of steam to the crew's quarters and to the heating coils of the cargo tanks. Appellee did work on the pump, and in the course of it dismantled and reassembled the pump unit. Immediately prior to the vessel's leaving the yard a leaky condition of the pump, caused by unsuitable packing, was discovered and the condition rectified. Some difficulty in the functioning of the boiler developed on the voyage, and at Los Angeles a representative of the manufacturer caused the pump unit to be taken ashore for repair. Appellant's claim appears to be that appellee incorrectly reassembled the pump and thus caused the difficulty. There was testimony both ways on this point. That of appellant appears to be largely of a hearsay or secondhand nature. On the other side, a representative of appellant had found the pump in good operating condition after the leaky condition, above mentioned, had been corrected. As to the Clayton boiler item, the court thought appellant had not sustained its burden of proving the repair work defective or otherwise than in accordance with good shipyard practice.

The work to be done on the telemotor steering system was covered by the original contract. All that was required of appellee was to "test out steering engine and steering gear and report condition found. Free up and lubricate mechanical equipment found in good order. Remove locking device from rudder before testing." There was evidence that the designated work was adequately and properly performed.

The telemotor is a hydraulic system connecting the controls in the pilot house with the electric steering motor in the after part of the ship. The telemotor system appears to have functioned perfectly on the sea trial, according to Mr. Gallagher, who was passing on the vessel for classification by the American Bureau of Shipping. Mr. Williams, also, testified that on the trial run the vessel steered properly and obeyed the rudder. The system was likewise functioning properly when the vessel sailed, and no trouble was encountered until she was about six miles outside of Port Angeles. The electrician who effected the repairs there stated that the system was "oscillating" because certain working parts had gotten out of proper mechanical adjustment. He expressed the opinion that the system had been tampered with, and pointed out his reason for so believing. Obviously the maladjustment observed might be traceable to the vessel's personnel, who for some hours had been in exclusive charge and control of her. The court found that the repair and servicing of the telemotor system was done in a workmanlike manner and in accordance with good shipyard practice, and that the failure later occurring was due to causes other than improper work of libelant. The finding as to this and the Clayton boiler item is shown in the footnote.[3]

supervision and control of the chief engineer of respondent vessel; that with respect to work on main engine of said vessel libelants undertook on their own responsibility no duty to determine the extent of repairs, servicing or testing necessary, but did only what the chief engineer of said vessel directed in pursuance of contract stipulation in that connection; that all work relating to main engine performed by libelants' employees as hereinabove described was done in a competent and workmanlike manner and was accepted and approved by claimant corporation; that claimant corporation has failed to sustain proof as to cause of main engine breakdowns and that whatever the cause or causes thereof were, claimant corporation has failed to sustain proof of allegations that said breakdowns and the damages, if any, resulting therefrom occurring subsequent to departure of vessel from Puget Sound were caused by any alleged malperformance by libelants or their employees."

3. "That all work performed by libelants on the telemotor and Clayton Boiler of respondent vessel was performed in a competent, workmanlike manner and in accordance with good shipyard practice, and was accepted and approved by claimant corporation; that claimant corporation has not sustained proof as to allegations of damage allegedly caused by libelants' malperformance concerning such work."

■ The major portion of the testimony was heard orally, including the highly important evidence relative to the supervision by the vessel's chief engineer of the work done on the main engine. It is not the function of this court to evaluate the evidence or to retry the case. Enough to say that the findings of the court are not clearly erroneous.

Appellant argues, however, that the burden of proof rested upon appellee to show that the damages were not proximately caused by any negligent act or omission on its part; and that the court was in error in assuming the contrary. Pan-American Petroleum Transp. Co. v. Robins Dry Dock & Repair Co., 2 Cir., 281 F. 97, is cited in support of this view. The argument predicated on that case rests on a rule of the law of bailments to the effect that, after the bailor has proved the bailment and shown a redelivery of the property in a defective condition, the burden of going forward is upon the bailee to prove that the damage was not due to his negligence. In the Pan-American Petroleum case, supra, the steamer George E. Paddleford, while under repair by the Dry Dock company, was taken possession of by the owner for the purpose of moving her from the dock to a different anchorage. In the maneuver the Paddleford collided with another vessel. Seeing that a collision was imminent, a captain of one of the tugs towing her, who was on the Paddleford's bridge, gave the order "full ahead." Instead of going ahead the ship went rapidly astern and the collision followed. The misinterpretation of the order was due to the crossing of the wire and chain connection leading from the bridge to the engine room. In the circumstances, the court thought that the burden was on the Dry Dock company to prove that the improper crossing of the connection was not attributable to fault or omission on its part.

■ The situation appearing in that case was an extraordinary one. The court held it to be a conclusively established fact that when the Paddleford was returned to the libelant's possession the wire and chain connection was crossed. The accident concededly occurred immediately thereaft-

er. The burden resting on the libelant to prove that at the time of the redelivery of the ship the telegraph was not properly adjusted was regarded as having been sustained, and the duty of going forward with the evidence rested, therefore, upon the defendant. That situation obviously does not obtain here.

Affirmed.