**MISSISSIPPI VALLEY BARGE LINE COMPANY, Plaintiff,**

v.

**T. L. JAMES & CO., Inc., Defendant.**

**T. L. JAMES & CO., Inc., and Brown & Root, Inc., doing business under the name of Louisiana Bridge Company, and T. L. James & Co., Inc., in its individual corporate capacity, Libellant,**

v.

**MISSISSIPPI VALLEY BARGE LINE COMPANY and THE M/V CHILDRESS, her engines, tackle, apparel, furniture, etc., Respondent.**

**Civ. A. No. 5320, Admiralty No. 2901.**

United States District Court E. D. Louisiana, New Orleans Division.

Sept. 25, 1956.

Lemle and Kelleher, Selim B. Lemle, Charles Kohlmeyer, Jr., New Orleans, La., for plaintiff and respondent.

Phelps, Dunbar, Marks, Claverie & Sims, Charles E. Dunbar, III, John W. Sims, New Orleans, La., for defendant and libellant.

J. SKELLY WRIGHT, District Judge.

This litigation presents a valiant but unsuccessful attempt to apply the law of common carriage to a contract of towage and thus avoid the public policy restrictions against release from liability for negligence clauses in towage contracts.[1] For the reasons hereinafter announced, this attempt fails, not only because certification as a common carrier under the Interstate Commerce Act [2] does not render the law with reference to towage

---

1. See Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911.

2. 49 U.S.C.A. § 901 et seq.

inapplicable, but also because the loss here was caused by improvident care of cargo, which, even under the Harter Act, is excepted from exoneration.[3]

On December 11, 1954 the barge La-Belle, in tow of the M/V L. Wade Childress and loaded with a valuable cargo of contractors' equipment, dumped its cargo and sank in the Mississippi River approximately opposite the Plaquemine Locks. At the time of the casualty the Childress was owned and operated by the Mississippi Valley Barge Line Company. The LaBelle was under bareboat charter to T. L. James & Co., Inc. and Brown & Root, Inc., d/b/a Louisiana Bridge Company, and the cargo of contractors' equipment was owned by T. L. James & Co., Inc.

The LaBelle was a converted ferryboat with a flat steel deck. It was 150' in length by 35' in breadth by 5'6" in depth. When originally built in 1922 it had a beam of 28'. On conversion, a 3' wide sponson, or blister, which ran the full depth of the hull to 40' from each end of the barge, was added to each side. Holes approximately 30" square and approximately 30" from the bottom plating were cut in the side plating of the original barge, leading into the wing compartments adjacent to the sponson. Ten-inch pipes had been run through the three fore and aft bulkheads about 1' up from the bottom of the barge. When removed in conversion, these 10" openings had not been closed. The five athwartship bulkheads of the original hull were watertight up to a few inches of the deck of the barge. The three fore and aft bulkheads were not watertight. Water moved freely from one side of the vessel to the other within the athwartship bulkheads.

3. 46 U.S.C.A. § 190.

4. The equipment consisted of:
1—54B Diesel Bucyrus Erie Dragline;
1—803 Diesel Koehring Dragline complete with one 2¼ cy. Hendricks dragbucket;
1—D8 Caterpillar tractor equipped with cable controlled Bulldozer;
1—Ford pickup (privately owned) loaded with employees' tool boxes;

On December 4, 1954, one week before the casualty in suit, the LaBelle departed New Orleans in tow for Krotz Springs, Louisiana, where on December 6, 1954 it was loaded with the contractors' equipment.[4] The loading was effected by grounding the forward end of the barge on the bank of the Atchafalaya River and working the equipment aboard. On December 6, 1954, the LaBelle departed Krotz Springs in tow of a pushing tug and arrived without incident at New Orleans on December 8, 1954, where custody of the barge in its loaded condition was accepted by Mississippi Valley. At the time, the LaBelle had a freeboard of approximately 2' port and starboard, 3' at the bow and 4' at the stern. She was in all respects trim and apparently seaworthy.

The LaBelle departed New Orleans December 10, 1954 at about 7:00 P.M. northbound up the Mississippi River for Cheatham Dam, Tennessee. It was incorporated as the lead barge in the starboard string in a tow of 18 barges with the towboat, L. Wade Childress, owned and operated by Mississippi Valley, pushing. About 2:00 on the morning of December 11th, the mate, Lowder, discovered water in the port and starboard wing compartments or holds of the barge, forward of amidship. Assisted by a deck hand, he placed a 3" electric pump into the starboard hold through the hatch opening and starting pumping operations. At 5:00 A.M., although the pump had gained considerably on the water, there was still about 1' of water in the hold. He allowed the pump to continue running and notified the second mate, who relieved him. Lowder testified that though the pump was placed in the starboard wing compartment, the port wing

1—8' x 10' Tool house loaded with miscellaneous rigging and rope supplies;
10—New—5' x 26' crane mats;
1—200 Amp. welding machine on skids;
1—Ford pickup loaded with one 200 amp. Lincoln welding machine and one cutting outfit.

compartment was being drained by it as well.

At 6:00 A.M. the second mate found that the holds had been pumped dry and stopped the pump. The pump was not started again until about 11:45 A.M. when the master on the bridge saw that the bow of the LaBelle was settling in the water. He instructed the mate to inspect the barge and, on being relieved by the pilot, proceeded to the barge himself. On arriving at the barge, he decided that the barge was so full of water that it should be beached. While the mate was attempting to install pumps through the hatchways which were accessible, the master ordered the barge "topped around," or pivoted around by letting go all lines except the stern lines on the starboard side, so that the barge could be towed high end forward to the beach on the east side of the river at Melody Point. Within a few minutes, however, the LaBelle dumped its cargo over its bow, broke loose from its moorings and sank, bow end first, into the Mississippi River. Subsequently, the LaBelle was raised. When the barge was inspected on dry dock, an L-shaped aperture in the bottom of the sponson, 2′ from the starboard side and 51′ from the stern, was discovered. The L-shaped aperture was approximately 30″ in size with the two legs of the L approximately 4″ in width.

This litigation was instituted by the filing of a civil action by the carrier to recover its transportation charges against T. L. James & Co., Inc. James answered denying liability and counterclaiming for $75,000 covering the loss of the contractors' equipment. Subsequently, James and Brown & Root, doing business as Louisiana Bridge Company, and James, individually, filed a libel in admiralty in which James reiterated the $75,000 claim for loss of the contractors' equipment and James and Brown & Root together, under the name of the Louisiana Bridge Company, additionally claimed $7,500 covering the cost of salvaging and repairing the barge LaBelle. The carrier answered this libel denying liability and filing an interpleader under Admiralty Rule 56, 28 U.S.C.A., against James claiming reimbursement from James of any amount which it might be required to pay because of any unseaworthiness of the barge, LaBelle, or any improper stowage of the cargo, on the theory that James had warranted to the carrier that the barge was seaworthy and that its cargo was properly loaded and stowed.

The carrier contends that the loss in suit was not caused by its negligence or the negligence of its employees, that water entering the LaBelle through the hole in the blister caused it to lose its buoyancy, and that the blister was holed during loading before the barge was delivered to the carrier's custody. In the alternative, it argues that, being a certificated common carrier under the Interstate Commerce Act, shippers are bound by its tariff filed with the Commission and incorporated in the bill of lading, which tariff exonerates the carrier from liability for any negligence on the part of itself or its employees. In any event, the carrier claims the protection of Section 3 of the Harter Act [5] which releases a carrier from liability for er-

5. Section 3 of the Harter Act, 46 U.S.C.A. § 192, reads:

"If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

rors in navigation or management of the vessel provided the owner thereof exercises due diligence to make the vessel seaworthy. The carrier also maintains that, under its tariff, it is entitled to payment of the freight in spite of the fact the cargo was never delivered.

T. L. James &. Co. and the Louisiana Bridge Company contend that involved here is a simple contract of towage and that no tariff filed with the Commission, or bill of lading issued pursuant thereto, can relieve the carrier for loss occasioned by the negligence of its employees. They also contend that they are not liable for the freight because it was not earned, because the provision in the bill of lading stating that freight shall become earned and payable at the beginning of the voyage is not enforceable as against public policy, and for the further reason that the bill of lading did not accompany the shipment, was not contemplated by the parties, and, in fact, was not issued until several weeks after the loss.

The history of the fight of the common carrier to relieve itself of the stringent liability imposed by the common law is well known. The history of the fight to exempt towage from common carrier liability is likewise well known. Unsuccessful in their attempt to obtain judicial approval for release from liability clauses in their carriage contracts,[6] the carriers persuaded the Congress to pass the Harter Act in 1893. With reference to towage contracts, the Supreme Court in 1955, having previously exempted the tower from carrier liability,[7] after backing and filling for many years,[8]

finally and definitively held that release from liability for negligence clauses in towage contracts are illegal as against public policy. Bisso v. Inland Waterways Corp., supra. Adjusting its cap to fit the change in circumstance, Mississippi Valley maintains that the contract of towage in suit is a contract of common carriage after all, and that as such it is entitled to the protection of Section 3 of the Harter Act [9] as well as the release from liability provisions of its tariff filed with the Commission pursuant to the Interstate Commerce Act.[10]

The carrier's contention is in the teeth of the opinion of the Supreme Court in Cornell Steamboat Co. v. United States, 321 U.S. 634, 64 S.Ct. 768, 88 L.Ed. 978. In deciding that persons engaged in the business of towage were subject to regulation as common carriers, the three-judge district court there held that "By labeling persons such as plaintiff 'common carriers' * * * they do not become such for all purposes" and that Section 320(d)[11] of the Interstate Commerce Act shows that Congress "had in mind the difference between the question of liability and that of regulation." D.C., 53 F.Supp. 349, 353. The Supreme Court, in affirming the district court, again referred to Section 320(d) of the Act and stated, 321 U.S. at page 637, 64 S.Ct. at page 770, "The Act * * * is designed, not to determine the legal status of vessels for all purposes, but to provide for regulation of the rates and services of competing interstate water carriers * * *." A study of the Cornell Steamboat litigation

6. Liverpool & Great Western Steam Co. v. Phenix Insurance Co., 129 U.S. 397, 438, 9 S.Ct. 469, 32 L.Ed. 788; New York Central Railroad Co. v. Lockwood, 17 Wall. 357, 84 U.S. 357, 21 L.Ed. 627.

7. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699.

8. Compania de Navegacion Interior, S.A., v. Fireman's Fund Ins. Co., 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787; The Steamer Syracuse, 12 Wall. 167, 79 U.S. 167, 20 L.Ed. 382. See also Sun Oil Co. v. Dalzell Towing Co., Inc., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311.

9. 46 U.S.C.A. § 192.

10. 49 U.S.C.A. § 901 et seq.

11. § 320(d) of the Interstate Commerce Act, 49 U.S.C.A. § 920(d) reads:
   "Nothing in this chapter shall be construed to affect any law of navigation, the admiralty jurisdiction of the courts of the United States, liabilities of vessels and their owners for loss or damage, or laws respecting seamen, or any other maritime law, regulation, or custom not in conflict with the provisions of this chapter."

through the Commission,[12] the district court, and the Supreme Court leaves no doubt that while a carrier engaged in towage may be required to be certificated under the Act, when that common carrier enters into a contract of towage, that contract is bound, as to liability, not by the law with reference to common carriage, but by the law with reference to towage.

The carrier cites numerous authorities[13] holding that both the carrier and the shipper are bound by the tariff filed with the Commission. These cases, however, refer to rate and related provisions of the tariff. None of them holds that an illegal provision in the tariff is enforceable. Certainly the inclusion of otherwise illegal release clauses in a tariff cannot make such clauses less illegal or more enforceable.

The carrier also argues, citing authorities,[14] that only the Interstate Commerce Commission has jurisdiction to inquire into the reasonableness of any provision of the tariff, and therefore this court is without jurisdiction in the premises. Here, however, no question of reasonableness is presented. The question presented is the validity of the release clause in suit. And the Supreme Court has held all release from negligence clauses in towage contracts illegal and unenforceable as against public policy. Bisso v. Inland Waterways Corp., supra.

The release from liability clauses relating to towage contracts and incorporated in the carrier's tariff are, therefore, unavailing to the carrier under Bisso, supra, and Cornell Steamship, supra.[15] So, also, are the provisions of the Harter Act.[16] Assuming the Harter Act is applicable, the carrier would nevertheless be responsible for the loss. The loss here was a direct result of the failure of the carrier properly to care for the cargo in suit. For such negligence, it may not be relieved from liability. See The Germanic, 196 U.S. 589, 25 S.Ct. 317, 49 L.Ed. 610; 46 U.S.C.A. § 190. The cargo here, assuming this is a carriage contract, was the barge itself as well as its contents, and the loss resulted from the carrier's negligent failure properly to tend the barge.

Irrespective of how or when the blister on the barge was ruptured, the fact remains that water in the hold, forward of the rupture in the blister, was discovered and pumped out the early morning of the day of the loss. There-

12. 250 I.C.C. 301.

13. Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 59 S.Ct. 612, 83 L.Ed. 953; Chesapeake & O. Ry. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983; New York Cent. & H. R. R. Co. v. York & Whitney Co., 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016; Pittsburgh, C., C. & St. L. Ry. Co. v. Fink, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151; Southern Railway Co v. Prescott, 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836; Atchison, Topeka & Santa Fe Ry. Co. v. Robinson, 233 U.S. 173, 34 S.Ct. 556, 58 L.Ed. 901.

14. United States v. Interstate Commerce Commission, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451; Terminal R. Ass'n of St. Louis v. United States, 266 U.S. 17, 45 S.Ct. 5, 69 L.Ed. 150; Dayton-Goose Creek Ry. Co. v. United States, 263 U.S. 456, 44 S.Ct. 169, 68 L.Ed. 388; Director General of Railroads v. Viscose Co., 254 U.S. 498, 41 S.Ct. 151, 65 L.Ed. 372; Northern Pac. Ry. Co. v. Solum, 247

U.S. 477, 38 S.Ct. 550, 62 L.Ed. 1221; Loomis v. Lehigh Valley R. Co., 240 U.S. 43, 36 S.Ct. 228, 60 L.Ed. 517; Texas & Pac. R. Co. v. American Tie & Timber Co., 234 U.S. 138, 34 S.Ct. 885, 58 L. Ed. 1255; Pennsylvania R. Co. v. International Coal Mining Co., 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446; Simpson v. Shepard, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511; Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472; Robinson v. Baltimore & Ohio R. Co., 222 U.S. 506, 32 S.Ct. 114, 56 L.Ed. 288; Aron v. Pennsylvania R. Co., 2 Cir., 80 F.2d 100, 103 A.L.R. 1367.

15. See also Petition of Reliance Marine Transp. & Const. Corp., D.C., 89 F.Supp. 272, 1950 A.M.C. 125.

16. The Harter Act, if applicable, would itself make null and void the release clauses in the tariff in so far as they sought to relieve against negligent care of cargo. 46 U.S.C.A. § 190.

after, instead of standing by the barge and inspecting the hold at regular intervals, water was not again discovered in the hold until the barge itself was noticed by the captain from the wheelhouse to be down by the head. Inspection at this time revealed that water was then in the hold in such quantity that a decision was made immediately to beach the barge. In an attempt to beach the barge after topping it around, the barge dumped its cargo into the river and sank. Allowing the barge to become so full of water that it was down by the head and in danger of sinking, particularly after being put on notice that the barge was making a controllable amount of water, is negligence of the grossest kind. Curtis Bay Towing Co. of Virginia v. Southern Lighterage Corp., 4 Cir., 200 F.2d 33; F. E. Grauwiller Transp. Co. v. Exner Sand & Gravel Corp., 2 Cir., 162 F.2d 90; Henry Du Bois Sons Co. v. Pennsylvania R. Co., 2 Cir., 47 F.2d 172. It was the direct and proximate cause of the loss in suit.

■ Carrier's expert's gratuitous speculation that the hole was punched in the blister during loading at Krotz Springs will not bear analysis. The loading was completed December 6th, after which the barge was delivered to Coyle at New Orleans at 4:00 A.M., December 8th, being towed loaded downriver from Krotz Springs. Inspection by carrier personnel at New Orleans indicated that the LaBelle, as loaded, was in satisfactory condition for towage upstream to Cheatham Dam, Tennessee. Water was first noticed in a forward hold of the vessel on the early morning of December 11th and the hold was pumped dry in a few hours. The LaBelle sank at noon the same day. On these facts, a finding of seaworthiness of the LaBelle at the time of its delivery to Coyle could easily be supported. The fact, however, that the LaBelle, prior to her loss, was making a controllable amount of water

which the carrier negligently failed to control makes the finding of seaworthiness at time of delivery to the carrier's custody unnecessary. Assuming unseaworthiness, the proximate cause of the loss was, not unseaworthiness, but negligent failure to control the water in the holds. Curtis Bay Towing Co. v. Southern Lighterage Corp., supra; F. E. Grauwiller Transp. Co. v. Exner Sand & Gravel Corp., supra; Henry Du Bois Sons Co. v. Pennsylvania R. Co., supra.

The carrier's suggestion that water shipped through the ruptured blister caused the barge suddenly to go down by the head and sink is unacceptable. The rupture in the blister was 51' forward of the stern of the 150' vessel. The hatches, port and starboard, through which the mate discovered water in the hold and pumped it out, were forward of amidship. Water may have been able to find its way from the blister to the body of the barge itself through the 2' x 30" holes in the skin of the vessel, and thence through three 10" holes, one in each of the three longitudinal bulkheads, across the width of the vessel.[17] But before that water could move forward, it had to rise almost to the deck of the barge in order to overcome the watertight athwartship bulkheads. Obviously, if the holds forward of amidship were kept dry by pumping, as they apparently could have been, no water would have reached the necessary height therein to pass over the watertight bulkhead into the next hold forward. Unless the water did so, the vessel would not have become down by the head and in danger of sinking. In other words, if the crew of the Childress had kept the water out of the holds by proper use of the pumps in the hatches which were accessible, sufficient water would not have been shifted forward to cause the vessel's bow to dive.

■ Finding the carrier responsible for the loss renders moot its claim for

---

17. Carrier's expert testified that, with the exception of the three 10" holes, the longitudinal bulkheads were "more or less" watertight. The proof shows, however, that when the mate, Lowder, pumped out the hold forward of amidship on the starboard side, it drained the corresponding hold on the port side as well.

freight. Holding T. L. James & Co. for the freight would only increase its damage collectible from the carrier.

Decree for libellants in the Admiralty action, for respondent in the impleader, and for defendant in the Civil Action.