MISSISSIPPI VALLEY BARGE LINE COMPANY, Appellant,

v.

INLAND WATERWAYS SHIPPERS ASSOCIATION, INC., a Corporation, et al., Appellees.

No. 16587.

United States Court of Appeals
Eighth Circuit.

April 26, 1961.

Rehearing Denied May 22, 1961.

Charles Kohlmeyer, Jr., New Orleans, La., for appellant. George B. Matthews and Lemle & Kelleher, New Orleans, La., and John O. Hichew and Thompson, Mitchell, Douglas & Neill, St. Louis, Mo., were with Charles Kohlmeyer, on the brief.

Wilder Lucas, St. Louis, Mo., for appellees. Jack R. Mandel, St. Louis, Mo., was with Wilder Lucas, on the brief.

Before SANBORN, VAN OOSTERHOUT, and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

This action for damage to goods shipped on two separate occasions was instituted in two counts in the Circuit Court of the City of St. Louis, Missouri, and because of diversity of citizenship and the amount involved, was removed by the defendant Mississippi Valley Barge Line Company, hereinafter referred to as "Valley" or "appellant", to the United States District Court, where, on trial by the court, a judgment was rendered in favor of plaintiffs on Count I in the amount of $3,386.31 and interest, and on Count II in the amount of $2,986.84 and interest. On this appeal we have for disposition the primary question of whether plaintiffs, under the relevant undisputed facts and under controlling legal principles, are barred from recovery.

Valley is a common carrier by water and operates barges in the transportation

of property. Plaintiff L. B. Foster Company, hereinafter called "Foster", purchased 620 bundles of new, galvanized iron prime fence pipe and employed plaintiff Inland Waterways Shippers Association, Inc., hereinafter called "Inland" (Foster and Inland, sometimes referred to as "appellees") to arrange for the transportation of the pipe from the manufacturer's plant in Pennsylvania to Foster's plant in Texas, and Inland, in turn, made arrangements for river shipment with Valley.

This pipe, which is the subject of Count I, was transported by rail from Sharon to Pittsburgh, Pennsylvania. Valley maintained no loading facilities at Pittsburgh and the actual loading was done by Marion Coal and Transfer Company, whose loading terminal was opposite Valley's fleet at the river in Pittsburgh. When a shipper had no loading terminal at Pittsburgh, Valley would notify Marion, and Marion would contact the shipper and make proper arrangements to act as stevedores. The shipper paid Marion's charges. In July of 1954, this pipe was loaded in Barge CTC-412, an open hopper type, by Marion. Valley's general freight agent at Pittsburgh testified that the barge was properly loaded "or we wouldn't have taken it out." Valley made up a loading diagram showing the position of the pipe after it was loaded on the barge. The 620 bundles were designated as Item 7, and constituted only a part of the entire cargo. On July 14, 1954, while the barge was being loaded, Valley's Pittsburgh office received a telegram from Valley's Houston, Texas office, advising that the barge was to stop at Cincinnati for additional tonnage. No covering was placed over the cargo in the barge and it was exposed to the weather. However, it was customary to ship galvanized pipe uncovered as it is not susceptible to damage from exposure to the elements.

Barge 412 as loaded by Marion, was moved by Valley to Cincinnati, where it was placed at Valley's own terminal and on July 27, 1954, under the personal direction and supervision of Valley's terminal manager, 281,990 pounds of old, rusty, muddy, dirty pipe were loaded and stowed by Valley on Barge 412, and admittedly a portion thereof was placed above and on top of the new galvanized pipe. This scrap pipe had been purchased by Foster at Cincinnati and was to be delivered to Foster in Texas. Valley placed no covering over the new pipe prior to placing the old and rusty pipe on the barge. The barge with its entire cargo exposed to the elements was then transported to New Orleans, Louisiana, arriving there August 10, 1954. During this transportation, at least one heavy rain fell. Another carrier transported the new pipe from New Orleans to Houston Texas, where it was unloaded, placed on a Missouri-Pacific railroad car and moved about 16 miles to the Pasadena Fence Company of Pasadena, Texas, which had purchased it from Foster while the shipment was en route. While the pipe was being transferred from the railroad car to trucks for further delivery, it was discovered that the galvanized pipe was damaged by stain caused by rust drippings. Pasadena refused to accept the shipment in the damaged condition and Foster was required to and did expend $3,386.31 in re-galvanizing the pipe. In summary, the foregoing constitutes the factual basis for Count I.

Count II grows out of the transportation by Valley of 10,000 feet of new prime electric-weld steel pipe purchased by Foster from Youngstown Sheet and Tube Company of Ohio in 1955. Again Inland was employed to arrange for transportation from the manufacturer's plant to Foster in Houston, Texas, and Inland made all arrangements with Valley for river shipment. The pipe was loaded by Marion Coal and Transfer Company from railroad cars at Pittsburgh, Pennsylvania, into Valley's barges. Lot 9, consisting of 29 pieces of pipe, Lot 10-35 pieces, and Lot 11-29 pieces, the lots which turned out damaged, were, according to Valley's barge loading diagram, placed in Barge MV-618. This loading

diagram shows no damage to any of the cargo at the time of the loading, except Lot 20, owned by other parties not involved in this action, which, according to the diagram, showed "bent tubing humped." Barge 618 was moved by Valley to Owensboro, Kentucky, where an additional 96,820 pounds of iron or steel billets were placed on board the barge, but the position of these iron or steel billets in the barge is not clear from the record. The loading diagram does reveal, however, that Lots 12 and 13, also the property of other parties, weighing a total of 204,090 pounds and including 22 bars weighing 4,209 pounds each, were placed immediately on top of Lots 9, 10 and 11, in Barge 618.

Barge 618 arrived at New Orleans, Louisiana and on June 9, 1955, it was transported from there to Houston, Texas, by another water carrier, where the cargo of pipe was placed on railroad cars and moved to Foster's plant. Upon arrival there, it was inspected and long dents were found in the walls of 43 pieces of pipe. The dented pipe was unusable and it was sold for scrap, resulting in a loss of $2,986.84, the amount of appellees' claim as incorporated in Count II of the complaint.

Three principal points are advanced in brief by appellant: Point I, "The Court erred in overruling defendant's motion for a judgment at the close of all the evidence"; Point II, "The exceptive clauses in the bill of lading validly exculpate Valley from liability herein"; Point III, "The Court erred in ruling that defendant had a common law and statutory duty to properly load, stow, and discharge the cargo."

Three contentions are made to support Point I: (a) that appellees failed to meet the burden of proving damage to the shipment on outturn; (b) appellees failed to prove the shipments were in good order and condition at the time they were received by Valley; (c) the carrier is not liable where improper loading of barge is done by the shipper under a "shippers load and count" bill of lading.

There is no question of appellees' burden of proof. Concededly, in order to present a prima facie case, appellees here were required to establish that the goods were handed over to Valley in good condition and outturned in a damaged condition. Valley's contentions of error in this regard turn simply on questions of fact. Under this circumstance, the findings of the trial court cannot be disturbed on appeal unless they are shown to be clearly erroneous. Rule 52 (a), Federal Rules of Civil Procedure, 28 U.S.C.A.; Cleo Syrup Corporation v. Coca-Cola Co., 8 Cir., 139 F.2d 416, 417, 418, certiorari denied 321 U.S. 781, 64 S.Ct. 638, 88 L.Ed. 1074; Pendergrass v. New York Life Ins. Co., 8 Cir., 181 F.2d 136, 137, 138. The record conclusively convinces that there was adequate factual support for the trial court's finding that both shipments were in good condition and order when received by Valley and that they were damaged as claimed on outturn.

The galvanized iron fence pipe, subject of Count I, was new and had been purchased from a reputable manufacturer; the damage resulted from rust drippings and rust stains—not from rusting of the pipe. The loading diagram prepared by Valley contained no notation that the pipe was damaged in any respect when received and placed on the barge. Scrap pipe was loaded on Barge 412 by Valley above and on top of the new galvanized pipe, which was not protected by covering or otherwise. Atmospheric conditions, such as dew, rain and fog, while the pipe was on the barge, were such as to cause rust to drip from the old pipe upon the galvanized pipe. An expert witness was of the opinion that the rust stains occurred while the pipe was in possession of Valley. Except while the galvanized pipe was on Valley's barge, it was not susceptible to rust stains as it was the only cargo on railroad cars.

The contention respecting the large steel pipe, subject of Count II, is equally untenable. The pipe was new when purchased. Valley made no record on the loading diagram that the pipe was dented

or damaged as was done with respect to Lot 20 (not involved here). The testimony of Valley's own expert witness convincingly refutes any argument that the pipe was not received in good condition or that it was not damaged when outturned. Mr. Schiffman, Vice-President of St. Louis Terminal Distributing Company, an expert in matters of barge-loading, after examination of the diagram showing the manner of stowing the cargo in Barge 618, and being apprised of relevant facts, was of the opinion that the dent damage possibly resulted from the placing of Lot 12, consisting of 22 bars weighing 92,610 pounds (each bar weighing in excess of 4,000 pounds) on top of Lots 11, 10 and 9, the steel pipe here involved.

■ The fact that no witness testified directly that the shipments were in good condition when received does not, in view of the strong circumstantial evidence present, effectively detract from the court's finding. See California Packing Corp. v. States Marine Corp. of Del., D.C. N.D.Calif., 187 F.Supp. 540, 542–543; Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha (The Glasgow Maru), 2 Cir., 102 F.2d 450; McNeely & Price Co. v. Ellerman & Bucknall S. S. Co., D.C. Pa., 100 F.Supp. 339; John R. Evans & Co. v. The Express, D.C.Pa., 100 F.Supp. 347; United States v. Apex Fish Co., 9 Cir., 177 F.2d 364; and compare, McNeely & Price Co. v. The Exchequer, D.C. Pa., 100 F.Supp. 343.

Subsidiary contention (a) of Point I and Points II and III, viewed collectively, rest upon the premise that a third party, Marion Coal and Transfer Company, did the physical loading of appellees' goods involved in both shipments; that in so doing Marion was acting as the agent for the shipper, and that the proximate cause of the damage was loading in a negligent manner by shipper which relieved Valley of liability for the damage. In effect, Valley's argument is founded upon three alternative propositions: first, that it never had a duty to load or stow the cargo either under the common law or by statute; secondly, that appellees effectively and affirmatively assumed this duty

under the shipper's load and count bill of lading; and thirdly, that certain provisions appearing on the reverse side of Valley's bill of lading and incorporated in its tariff, effectively exculpate Valley from damages caused by improper loading or stowage.

■ It is necessary to first carefully define the area of law which must govern resolution of the issues presented on this appeal. Of primary importance is the fact that Valley was carrying the goods here involved under a contract of affreightment; it was acting as a common carrier by water. Hence, we need not concern ourselves with consideration of duties and liabilities springing from contracts of mere towage alone, or from charter arrangements between parties. See Oxford Paper Co. v. The Nidarholm, 282 U.S. 681, 51 S.Ct. 266, 75 L.Ed. 614; Sacramento Nav. Co. v. Salz, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663; The Steamer Syracuse, 12 Wall. 167, 79 U.S. 167, 171, 120 L.Ed. 382; Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911; Southwestern Sugar & Molasses Co. v. River Terminals, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334; The Coastwise, 1 Cir., 233 F. 1, 4; Baltimore & Boston Barge Co. v. Eastern Coal Co., 1 Cir., 195 F. 483, 485; Mississippi Valley Barge Line Co. v. T. L. James & Co., D.C.E.D.La., 144 F.Supp. 662, affirmed, 5 Cir., 244 F.2d 263, certiorari denied, 355 U.S. 871, 78 S.Ct. 121, 2 L. Ed.2d 76; 48 Am.Jur. Shipping § 323; Gilmore & Black, "Law of Admiralty," 1957, at p. 215 et seq.

At common law, a common carrier of goods by water was almost an insurer, being absolutely responsible for the safe arrival of cargo, unless the loss or damage was caused by an Act of God or of the public enemy, or by the inherent vice of the goods or the fault of the shipper, and even when the loss was caused by one of these, the carrier had to be free from negligence. Propeller Niagara v. Cordes, (21 How., 7) 62 U.S. 7, 23, 16 L.Ed. 41; The Willdomino, 3 Cir., 300 F. 5, 9, affirmed S. S. Willdomino v. Citro Chem. Co., 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed.

491; Gilmore and Black, "The Law of Admiralty," supra, at p. 119. As bills of lading came into general use, water carriers began to insert various exculpatory clauses exempting them from liability for certain types of damage and eventually the bills came to include the exemption of the carrier even for damage resulting from its own negligence. Such negligence exemptions were generally upheld by the British courts, while the federal courts of the United States struck them down as being against public policy. See The Delaware, 161 U.S. 459, 471–474, 16 S.Ct. 516, 40 L.Ed. 771; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 437–463, 9 S.Ct. 469, 32 L.Ed. 788.[1] This was the historical setting which led to passage of the Harter Act of 1893, 27 Stat. 445, 46 U.S.C.A. §§ 190–196, designed to afford the cargo interests some protection against the exculpatory clauses and at the same time to permit the carriers to avoid liability under certain circumstances. Subsequently, and in 1936, the Carriage of Goods by Sea Act, 49 Stat. 1207 et seq., 46 U.S.C.A. §§ 1300–1315 (Cogsa), was enacted, supplanting the Harter Act in some respects.

We first give consideration to the design and purpose of the Harter Act which concededly is applicable to the water carriage here involved. This statute does not lay down positive rules of law as to duties, responsibilities or liabilities—it does not impose any affirmative obligation on carriers. It simply forbids certain stipulations in the bills of lading. Since portions of the Act are of major importance in resolving the instant case, it is expedient that we set out the applicable provisions at some length:

" § 190. Stipulations relieving from liability for negligence.

"It shall not be lawful for the * * * owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from *negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge.* Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect." (Emphasis supplied).

"§ 191. Stipulations relieving from exercise of due diligence in equipping vessels.

"It shall not be lawful for any vessel transporting merchandise or property from or between ports of the United States of America and foreign ports, her owner, master, agent, or manager, to insert in any bill of lading or shipping document any covenant or agreement whereby the obligations of the owner or owners of said vessel to exercise due diligence [to] properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage, or whereby the obligations of the master, officers, agents, or servants *to carefully handle and stow her cargo and to care for and properly deliver same,* shall in any wise be lessened, weakened, or avoided." (Emphasis supplied).

Section 192 of the Act was designed to be a concession to the carriers, relieving them of strict common law liability. It provides:

"If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied,

---

1. Much of the background and historical material may be found in Gilmore and Black, supra, "The Law of Admiralty."

See also, 48 Am.Jur., Shipping §§ 381, 465.

neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners * * be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

Although Cogsa is not here applicable since admittedly it applies only to shipments by sea to or from ports of the United States in foreign trade, we nevertheless refer briefly to portions thereof in order to intelligently consider and discuss Valley's position. In contrast to the Harter Act, Cogsa, in regulating bills of lading, imposes certain positive responsibilities and liabilities upon the carrier and ship, including among others § 1303 (2), that the carrier "shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." Thus, in considering Harter and Cogsa, it will be seen that Cogsa imposes an affirmative duty to use care in respect to the cargo while Harter forbids stipulations which eliminate the common law duty to exercise care in respect to the cargo. See Gilmore and Black, supra, at p. 127.

We now give attention to the stipulation found in the bills of lading covering the shipments herein and upon which Valley relies to escape liability. Appearing on the reverse of the bill covering the

pipe, which is the subject of Count II, we find this language:

"Sec. 10(a) * * * liability is assumed for general average, salvage charges and physical damages to or loss of the shipment howsoever occurring (including, but not limited to, fire, explosion, marine perils and Acts of God); *provided that the carrier shall not be liable for* delay in the delivery of the shipment, or for loss of, damage to, or any expense in connection therewith, caused directly or indirectly by or resulting from or arising out of: shrinkage, expansion, or other change due to natural causes; any vice or defect in the shipment (including country damage to cotton); the act or default of the shipper or owner; *insufficiency of packing; improper stowage, or the physical act of loading or unloading, when not performed by carrier.* * * * *"*[2] (Emphasis supplied).

In summary, Valley's position in relying upon this exemption is that the terms incorporated in its bill of lading are a part of its approved tariff and that such provisions, including a stipulation as to "shipper's weight, load and count," are all valid and in accordance with the Federal Bills of Lading Act, § 21, 39 Stat. 541, 49 U.S.C.A. § 101. Although conceding the applicability of the Harter Act, Valley advances the ingenuous argument that, inasmuch as this statute imposes no affirmative duties, in contrast to Cogsa, it never is under duty to load and stow the cargo, thus in effect arguing that it would only be unlawful and contrary to the statute to exempt itself from liability for improper loading and stowage if it had expressly stipulated, agreed to assume, and did assume, the duties of loading and stowage.

As we view the history of the Harter Act and the plain and explicit provisions thereof, we are satisfied and convinced

---

2. There is some question raised as to changes in tariff provisions applicable to the two separate shipments, the main difference being that one tariff did not include the term "improper stowage."

However, for the purposes of this opinion, we shall proceed on the theory that both bills of lading purported to except liability for improper stowage.

that the voiding of exculpatory clauses for "negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery," encompassed in § 190, and the provision of § 191 making it unlawful to insert in any bill of lading any agreement "whereby *the obligations* of the master * * * to carefully handle and stow her cargo and to care for and properly deliver same, shall in any wise be lessened, weakened, or avoided," presuppose an outstanding duty imposed by law in this regard. (Emphasis supplied). See, The Germanic, 196 U.S. 589, at page 596, 25 S.Ct. 317, 49 L.Ed. 610, decided prior to Cogsa. Valley has not cited any case directly supporting its contention that it had no such duty. The cases upon which it places reliance involve private charter of vessels, or contracts of mere towage, where, by the terms of the contract, the shipper has undertaken the duties of loading, stowage, etc. See discussion and cases cited page 378, supra. Likewise, of no persuasive consideration are cases involving rail carriers, frequently bringing into play a "shipper's load and count" bill of lading. See Robinson v. New York Central R. Co., 245 App.Div. 378, 282 N.Y.S. 877, affirmed, 270 N.Y. 659, 1 N.E.2d 985; Perkel v. Pennsylvania R. Co., 148 Misc. 284, 265 N.Y.S. 597; South Carolina Asparagus Growers' Ass'n v. Southern Ry. Co., 4 Cir., 46 F.2d 452; Standard Hotel Supply Co. v. Pennsylvania R. Co., D.C.S.D.N.Y., 65 F.Supp. 439, upon which Valley relies. Under the circumstances presented by this record, reliance upon a shipper's load and count bill of lading flies in the very teeth of the prohibitions of the Harter Act, supra. We have been cited to no case sustaining such a bill of lading in the face of this statute, and our independent research has not revealed a case precisely in point although there are, of course, cases involving ocean going vessels arising before and after Cogsa which reiterate the proposition that a water

carrier is liable for faults or omissions in regard to the loading, stowage and care of goods en route. See United States v. Apex Fish Co., 9 Cir., 177 F.2d 364; Schnell v. The Vallescura, 293 U.S. 296, 305, 306, 55 S.Ct. 194, 79 L.Ed. 373; General Foods Corporation v. The Troubador, D.C.S.D.N.Y., 98 F.Supp. 207, 210; The Charlton Hall, D.C.S.D.N.Y., 285 F. 640; The Germanic, 196 U.S. 589, 255 S.Ct. 317; Establissements Edouard Materne v. The S. S. Leerdam, D.C.S.D.N.Y., 143 F.Supp. 367; and see Mackey v. United States, D.C.S.D.N.Y., 83 F.Supp. 14, affirmed, 2 Cir., 197 F.2d 241 (involving loss of goods before actual loading on board vessel). From these cases it readily appears that proper stowage of goods is of particular importance in water carriage, both for the seaworthiness and safety of the vessel, as well as for proper care of the goods en route. See The Germanic, supra, 196 U.S. 589, 255 S.Ct. 317, where it was found that negligent unloading so disturbed the center of gravity of the ship that it sank at the dock.[3] In the record before us there was evidence that Valley was much concerned with the supervision and problems of proper loading and stowage. One of Valley's agents testified that improper loading can result in a barge standing on end, or buckling. The significance of this matter was pointed out by another agent in these words:

"But a hopper barge is particularly vulnerable to that type of loading because you haven't got the support. You have got to distribute your load even in loading. You have —now you have got three lots even in loading. You have to load it separately so as not to put an extra stress on a hopper barge."

The case of Abbott v. Tompkins, Tex. Civ.App., 1926, 283 S.W. 647, is of particular interest, inasmuch as there, apart from the question of the Harter Act, the court discussed the duty of the barge

---

**3.** In the opinion of the lower court it appears that the master and crew of The Germanic had no actual part in the negligent unloading, since discharge of the cargo was effected and supervised by stevedores. See The Germanic, 2 Cir., 124 F. 1, pp. 6, 7.

owner under the common law for proper loading and stowage of cargo. The cargo there involved was rice and the loading was done by warehousemen acting as agents for the shipper. The jury found that the loading was negligently performed, in that the rice should have been stacked in pyramid form to shed water, and that this negligence was the proximate cause of the damage. In reversing the judgment for the carrier, the court observed, at page 648:

> "Where the shipper assumes the duty of loading, the carrier may refuse to accept the goods for transportation when the loading is done in an improper or unsafe manner. If the carrier, with full knowledge of the manner in which the loading was done, does accept the shipment without objection, the shipper may assume that the manner of loading was satisfactory. to the carrier."

As to the contention that the tariff provisions are valid until the Interstate Commerce Commission takes some action to disapprove them, it is clear to us that if the provisions of a tariff are in derogation of the Harter Act, they are invalid and unenforceable, even though embodied in the tariff, and no recourse need be had to the Interstate Commerce Commission before the court can act. See Southwestern Sugar Co. v. River Terminals, supra, 360 U.S. 411, footnote 9 at page 420, 79 S.Ct. 1210, 3 L.Ed.2d 1334; Mississippi Valley Barge Line Co. v. T. L. James & Co., supra, 144 F.Supp. 662, at page 667, 244 F.2d 263 at page 267.

The argument is also advanced that the Harter Act has been modified by the provisions of the Bills of Lading Act, 49 U.S.C.A. §§ 81–124, which was subsequently enacted. We are not so persuaded. There is nothing in the latter statute to suggest that Congress intended to repeal the Harter Act provisions, and the two Acts may reasonably be read together as compatible legislation. See Gardner v. The Danzler, 4 Cir., 281 F.2d 719, 724–726.

In summary, we hold that Valley, acting here as a common carrier by water, and regardless of the actual extent of its supervision and control of Marion, was under a legal duty to properly stow, care for and deliver the two shipments; that the damage was proximately caused by negligence in these particulars; and that the attempt to relieve itself of the obligation "to carefully handle and stow [the] cargo and to care for * * * [the] same" was without legal effect.

The judgment is

Affirmed.