**COMPANIA MARITIMA del NERVION,**
Libellant,

v.

**AMEROP COMMODITIES CORPORA-TION,** Cargill Incorporated, Union Barge Line Corporation and **BARGE UBL-117,** Respondents.

No. 4513.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 16, 1964.

Robert B. Deane, Chaffe, McCall, Phillips, Burke, Toler & Hopkins, New Orleans, La., for libellant.

Clarence F. Favret, New Orleans, La., for respondent Amerop Commodities Corp.

J. Barbee Winston and Gerard T. Gelpi, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for respondent Cargill, Inc.

Charles Kohlmeyer, Jr., Lemle & Kelleher, New Orleans, La., for respondent Union Barge Line Corp. and Barge UBL–117.

FRANK B. ELLIS, District Judge.

Compania Maritima del Nervion, hereinafter referred to as Nervion Lines, has instituted this libel in order to recover for the delay and additional expenses incurred by their vessel, the S/S MAR TIRRENO, due to the discovery of red ants in a cargo of soymeal.

In the early afternoon of June 7, 1960, a cargo of soymeal destined for trans-Atlantic shipment was in the course of being loaded at the Port of New Orleans from the Barge UBL–117 into libellant's vessel, the S/S MAR TIRRENO. After more than half of the cargo had been discharged from the barge, the loading operations were suddenly interrupted when a considerable number of red ants were found to be crawling about a newly uncovered layer of sacks in the barge, while others, though fewer in number, were found to be crawling among those sacks of soymeal which had already been transferred into the hold of libellant's vessel. The master of the vessel and the cargo inspectors agreed with representatives from local insect-exterminating companies that the ants in the ship's hold had to be exterminated before the vessel could complete its loading operations. It was agreed that the most economical and expedient method was to discharge the sacks of soymeal from the vessel back into the barge and spray the empty hold of the ship, rather than fumigate the sacks of soymeal in the ship separate from those in the partially-discharged barge. As soon as the hold was fumigated, the supplier succeeded in furnishing a substitute cargo of bagged soymeal and thus avoided the delay which fumigation of the reloaded barge would have entailed.

The numerous commercial relationships involved in this libel may be briefly summarized as follows: On April 29, 1960, Comisaria General de Abastecimientos y Transportes of Madrid, hereinafter referred to as C.G.A.T., confirmed its order to purchase from Amerop Commodities Corporation of New York (Amerop), five thousand metric tons of soybean meal to be delivered over a period of several months to various vessels at New Orleans for trans-Atlantic shipment. The conditions which specified the quality, quantity, price and details of delivery for the entire sale were set forth in a letter of credit issued to Amerop by the First National City Bank of New York on behalf of the buyer, C.G.A.T. One of the conditions specified that the containers would be suitable for export shipment. Amerop then contracted to purchase from Cargill, Inc., approximately 5,000 metric tons of bagged soymeal for delivery F.A.S. New Orleans. When Cargill was unable to supply the entire 5,000 tons, Amerop was successful in obtaining from North American Continental Co. (North American) the remaining balance of 900 tons necessary to complete its order. These 900 tons had previously been purchased by North American from Cargill and still remained unprocessed at Cargill's Vegetable Oil Plant in Memphis, Tennessee. Thus, Amerop arranged to purchase this particular amount of 900 tons of soymeal from North American, and North American in turn negotiated to have Cargill process, bag and arrange delivery of that specific amount to New Orleans in conjunction with the delivery of Amerop's purchase from Cargill. In furtherance of the above agreement, Cargill arranged to have Union Barge Lines, Inc. furnish a barge to Cargill at Memphis for the loading and delivery of approximately 900 metric tons of bagged soymeal F.A.S. to the S/S MAR TIRRENO at New Orleans. Thus, all 5,000 tons were to be processed, bagged and shipped from Cargill's Memphis plant on the Mississippi River to several nominated vessels at New Orleans.

A determination concerning the origin of the cargo's ant infestation is prerequisite to any conclusion regarding the liabilities and indemnities claimed in this libel. The testimony of the various witnesses concerning the processing, bagging and loading of the soymeal at Cargill's Memphis plant substantially supports a finding that the soymeal was

entirely free of ant infestation upon delivery of the cargo to the Barge UBL–117 at Memphis for carriage downstream to New Orleans. The testimony relating to the barge's previous cargo of scrap metal and the manner in which the barge was cleaned and lined with heavy paper to protect the bags from moisture negates the possibility that ants were in the barge at the time the cargo of bagged soymeal was loaded. Furthermore, several witnesses who had held positions for some time at Cargill's Memphis plant testified that they had never seen any red ants in or around Cargill's plant. Additionally, an entomologist from the United States Department of Agriculture who had been assigned to the Memphis area testified that to the best of his knowledge, based on intensive inspections across the State of Tennessee, there had been no known red ant infestations in that state in 1960.

As was previously stated, when the red ants were discovered at the time of the unloading and transferral of the cargo from the Barge UBL–117 to libellant's vessel which was then docked at the Robin Street Wharf in New Orleans, a sizeable concentration of the ants were located among the sacks of soymeal still in the barge, whereas only a relatively few were scattered throughout the hold of libellant's vessel. At the time of the unloading, the barge was on the offshore side of the S/S MAR TIRRENO which is approximately 60 feet wide and whose top deck was then riding about 40 to 50 feet above the water line. Several witnesses testified that as long as they had been working on the Robin Street Wharf, both before and after this occasion, they had never noticed the presence of red ants anywhere in the immediate vicinity of the wharf. Together these facts suggest that the ants' entry into the cargo probably did not occur while the Barge UBL–117 was unloading alongside the S/S MAR TIRRENO.

The Barge UBL–117 was a one-deck barge with hatch covers which slid back and forth over the top of the hatch by means of small rollers on tracks along the coamings of the barge. The covers were provided with lips which extended over the edge of the roller and track in order that water could drain off the hatch cover onto the side decks without entering into the hatch. However, the covers were not completely air-tight since air could flow under the lip of the hatch cover and into the hatch itself. There was testimony to the fact that insects such as ants could also possibly get under the hatch cover lip and into the hatch.

The itinerary of the Barge UBL–117 reveals that the barge moved from the Cargill Plant at Memphis on May 20, 1960, with a cargo of 607 net tons of bagged soymeal, and arrived at the Coyle Fleet Landing on the Mississippi River in New Orleans on May 28, 1960, where it was then moored. It remained at the Coyle Fleet Landing for approximately eight days until it was shifted alongside the S/S MAR TIRRENO on June 6, 1960. The Coyle Fleet Landing is separated from the land by piling and wharfing which stand approximately a yard out from the levee. The supervisor of a recognized insect-exterminating company in New Orleans testified that the type of red ants involved in this libel can be found along the banks and levees of the Mississippi River around New Orleans, and also on outer pilings and along the wharf area. He further testified that when these ants, commonly known as "flying red ants" are in their winging phase, they are capable, when aided by an air current, of sustained flight for a distance of hundreds of feet.

It thus appears very conceivable, and this Court finds, that the red ants discovered in the cargo of soymeal aboard the Barge UBL–117 had migrated from the levee or from the pilings and wharfing along the banks of the river at the Coyle Fleet Landing to the barge, and then through the space between the hatch covers and the barge coamings into the cargo of bagged soymeal.

■ Service of process herein was effected upon Amerop, a foreign corporation, through the Louisiana Secretary of State on the basis of Amerop's engagement in sufficient "business activity" within the State as is provided for by Article 6 of the Louisiana Code of Civil Procedure, in general, and by Section 13:3471(1) of the Louisiana Revised Statutes, in particular. Amerop reserved its exception to the jurisdiction and again moves to be dismissed from this action on the grounds that its relations with the State did not constitute sufficient business activity to render it amenable to this Court's jurisdiction. An identical motion was formerly urged by the same party and was denied without written reasons on June 13, 1961. That ruling does not now appear to have been either clearly erroneous or manifestly unjust, and this Court therefore invokes the doctrine of "law of the case" in again denying Amerop's motion to dismiss for lack of *in personam* jurisdiction. See Messinger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912); White v. Higgins, 116 F. 2d 312, 317 (1st Cir. 1940); and 1 Moore's Federal Practice 4201, § 404 [1]. However, since the prior denial of the motion did not include written reasons, the Court shall now take this opportunity to explain its decision.

■■ The admiralty jurisdiction of a United States District Court is co-extensive with the territorial boundaries of the state within which it sits, Hunt v. Paco Tankers, Inc., 226 F.Supp. 279, 280, (S.D.Tex.1964), and as such is no less extensive than that jurisdiction which would be found in civil cases. In re The Louisville Underwriters, 134 U. S. 488, 10 S.Ct. 587, 33 L.Ed. 991; Riinc, Inc. v. Peddie, 195 F.Supp. 124, 126 (E. D.Ill.1961). Here, the question of *in personam* jurisdiction over a foreign corporation must be resolved by reference to the conceptual limits of jurisdictional due process expounded in International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); and subsequent interpretations of Section 13:3471(1) of the Louisiana Revised Statutes.[1]

■■ In International Shoe Co. the Supreme Court decided that a juridical personality's minimum contacts within a given jurisdiction could satisfy the requirements of due process if the maintenance of the suit would not offend "traditional notions of fair play and substantial justice." 326 U.S. at 316, 66 S.Ct. at 158. In the same case, this broad test was somewhat refined by the statement that

> "[w]hether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." 326 U.S. at 319, 66 S. Ct. at 160.

It would thus appear that the meaning of due process in this context can be determined only by judicial evaluation of the competing interests, namely, those of a defendant in not being called upon to defend in that forum, those of a plaintiff in being able to acquire jurisdiction over a defendant in the place where the cause of action arose, and finally the interest of the state in being able to afford adequate protection of its laws to its citizens and to others within its jurisdiction.

In McGee the concept of due process was more definitively interpreted in the light of the apparent technical and economic realities of contemporary commer-

---

1. In a civil diversity suit, the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny compels this court to follow state procedural rules where they are outcome-determinative. For a carefully reasoned discussion of this question, see the opinion of Friendly, J. in Arrowsmith v. United Press International, 320 F.2d 219 (2d Cir. 1963); see also, Nigro v. Eagle Star Ins. Co., 216 F.Supp. 205 (E.D.La.1963).

cial activity. There the Court decided that it was "sufficient for purposes of due process that the suit was based on *a contract which had substantial connection with that State.*" (Emphasis supplied) 355 U.S. at 223, 78 S.Ct. at 201.

■ The pertinent part of the recently amended Louisiana statute concerning jurisdiction over non-resident corporations now reads as follows:

"If the foreign corporation is not one required by law to appoint an agent for the service of process, but has engaged in *a business activity* [2] in this state, service of process in an action or proceeding on a cause of action *resulting from* [3] such business activity in this state * * * shall be made on the secretary of state * * *." (Emphasis and footnote supplied) Louisiana R.S. 13:3471(1), as amended by Act No. 32, § 1, of 1960.

The general intent of this statute is to permit Louisiana to exercise the full potential of jurisdiction *in personam* over foreign corporations allowed by International Shoe and McGee.[4] Buckley v. The New York Times, 338 F.2d 470 (5th Cir. 1964).

■ The conduct of a "business activity" in Louisiana, namely the shipment of soymeal into Louisiana and the delivery of same to vessels at New Orleans for trans-Atlantic carriage, was a necessary condition for the fulfillment of the contract between Amerop and C.G.A.T. Furthermore, this contract necessitated the making of related con-

tracts in Louisiana, particularly for inspection and an examination of the cargo, and for the employment of longshoremen to discharge the soymeal from the Barge UBL–117 into the hold of libellant's vessel. Thus, the contract can be understood as one which had "substantial connection" with Louisiana.[5] Once this commercial activity gave rise to the present cause of action, the commercial act became a judicial fact which permitted jurisdiction over Amerop, especially under the language quoted from the McGee case, the criteria set forth in the cited Louisiana statute, and the jurisprudence and legislative comments interpretive thereof.

According to the terms of Nervion Line's contract of carriage (Libellant's Exhibit 14, par. 4), the cargo of soymeal became liable for the extra expenses incurred by Nervion due to the delay and for the services rendered to the cargo. In consideration of the payments made by Nervion on behalf of C.G.A.T. for the above-incurred expenses, C.G.A.T. subrogated to Nervion all of its rights arising out of this action. (See Libellant's Exhibit 20).

■ Among the conditions of sale incorporated in the letter of credit issued to Amerop by the First National City Bank of New York on behalf of C.G.A.T., there was a provision that the containers would be "suitable for export shipment" (Amerop Exhibit 2, par. 5). Such terms can be understood as precluding insect infestation of the sack containers. Therefore, Amerop is liable to Nervion, subrogee of C.G.A.T.'s rights, for damages sustained due to Amerop's failure

2. Whereas the earlier version of the statute contained the plural phrase "business activities", the amended version can be understood as extending the scope of jurisdiction over foreign corporations by having changed the plural phrase to the singular of "a business activity". See 38 Tul.Law Rev. 167 (Dec. 1963.)

3. This Court has recently considered the jurisdictional-limiting effect of the term "resulting from" used in the statute. See Buckley v. The Beaumont Enterprise, 232 F.Supp. 986, 988 (E.D.La.1964).

4. See the Explanatory Note to the 1960 amendment of La.–R.S. 13:3471(1). Reference to those Law Institute comments is appropriate in aid of interpreting and construing provisions of the Louisiana Code of Civil Procedure. State ex rel. Ballett v. Gremillion, La.App., 168 So.2d 270, 271–272 (1964).

5. Harnischfeger Sale Corp. v. Sternberg Co., 179 La. 317, 154 So. 10 (1934).

to provide a cargo suitable for export shipment.

██ Amerop's purchase from North American of the particular quantity of soymeal necessary to complete the entire order caused North American and Cargill to change the provisions of their contract of sale in order to provide for delivery of the soymeal to New Orleans F.A.S. the S/S MAR TIRRENO, a vessel designated by Amerop. (See Amerop Exhibits 3, 4B and 5). Thus Amerop, as third-party beneficiary of the contract between North American and Cargill, is entitled to recover damages from Cargill as a result of the latter's failure to deliver this particular consignment of soymeal F.A.S. New Orleans in a state of merchantable quality.

██ By virtue of its contract with Cargill (St. Clair Exhibit #5) to carry and deliver the soymeal aboard the Barge UBL–117 to New Orleans, Union Barge Line assumed a legal duty to care for and to deliver the sacks of soymeal in the same condition as received in Memphis. Union Barge Line further had the duty to ascertain the nature of the cargo and to exercise due care in its handling, including the employment of such methods as the nature of the cargo would reasonably require. The Willfaro, 9 F. 2d 940 (N.D.Cal.1925), affd. Williams S.S. Co. v. Wilbur, 9 F.2d 622 (9th Cir. 1925), cert. den'd 271 U.S. 666, 46 S.Ct. 482, 70 L.Ed. 1140; The Ferncliff, 22 F.Supp. 728 (D.Md.). As carrier, Union Barge Line is liable for any damage caused by its negligence in the care and custody of the cargo. Mississippi Valley Barge Line Co. v. Inland Waterways Shippers Ass'n, Inc., 289 F.2d 374 (8th Cir. 1961) cert. den'd 368 U.S. 876, 82 S.Ct. 123, 7 L.Ed.2d 77.

██ This Court finds that Union Barge Line was negligent in mooring a cargo of soymeal in close proximity to the banks and levee of the Mississippi River around New Orleans when it knew or should have known that area to be potentially infested by nests of insects such as flying red ants, particularly during the spring and summer months. Therefore, Cargill, Inc., is entitled to be indemnified for the liability it sustained due to the negligence of Union Barge Line in the care and custody of the cargo in question.

Finally, based on libellant's exhibits 11–A through 11–O inclusive, this Court determines that the quantum of damages is established for the sum of $8,278.25 and consists primarily of additional dockage, fumigation, inspection, demurrage and stevedoring expenses.

Thus, Nervion, as subrogee of C.G. A.T.'s rights, is entitled to recover from Amerop for the stated amount of damages sustained due to Amerop's failure to provide a cargo suitable for export shipment. In turn, Amerop, as third-party beneficiary of the contract between North American and Cargill, is entitled to recover over from Cargill for damages sustained as a result of Cargill's failure to deliver the particular consignment of soymeal in a state of merchantable quality. Cargill is then entitled to recover over from Union Barge Lines for damages sustained due to Union's negligence in the care and custody of the cargo.

Judgment in the amount of $8,278.25 will therefore be entered for and against each party, according to the above findings of fact and conclusions of law.